TYACK, J., dissenting.
 {¶ 63} Primarily because I do not believe that the state of Ohio conducts the multi-state lottery, but only participates in it, I dissent.
 {¶ 64} The Ohio Constitution could not be more clear. Section 6, Article XV reads:
 {¶ 65} "Except as otherwise provided in this section, lotteries, and the sale of lottery tickets, for any purpose whatever, shall forever be prohibited in this State.
 {¶ 66} "The General Assembly may authorize an agency of the state to conduct lotteries, to sell rights to participate therein, and to award prizes by chance to participants, provided that the entire net proceeds of any such lottery are paid into a fund of the state treasury that shall consist solely of such proceeds and shall be used solely for the support of elementary, secondary, vocational, and special education programs as determined in appropriations made by the General Assembly.
 {¶ 67} "The General Assembly may authorize and regulate the operation of bingo to be conducted by charitable organizations for charitable purposes."
 {¶ 68} When the current Ohio Constitution was adopted in 1851, it banned all lotteries "forever." Section 6, Article XV, was modified in 1975 to allow for the exception which permits "an agency of the state to conduct lotteries." In 1987, the last paragraph of Section 6, Article XV, was amended to allow charitable bingo.
 {¶ 69} In interpreting Section 6, Article XV, we must begin with the actual words of the constitution as approved by the electorate. The voters did not authorize the state of Ohio to contract with a third party to conduct a lottery. The voters instead authorized only an agency of the state to conduct lotteries, even to the point of allowing only an agency of the state to sell the lottery tickets and to award the prizes. All other forms of conducting a lottery in Ohio are still "forever * * * prohibited."
 {¶ 70} An agency of the state of Ohio is clearly not conducting the multi-state lottery commonly known as "Mega Millions." Instead, the Ohio Lottery Commission is contracting with a much larger entity, referred to in the Amended and Restated Multi-State Lottery Agreement as "the Party Lotteries" which, in fact, conducts the multi-state lottery. The Ohio Lottery Commission has no control over how this lottery is conducted in other states and only partial control in the state of Ohio. Instead, the Ohio Lottery Commission has one vote, matched or overcome by the votes of other states, as to most of the particulars of how the multi-state lottery will be conducted in all the states which participate, including Ohio.
 {¶ 71} The only significant power retained by the Ohio Lottery Commission which can be unilaterally exercised in the multi-state lottery agreement is the power to withdraw.
 {¶ 72} Stated simply, the Ohio Lottery Commission and the state of Ohio are not conducting the multi-state lottery known as "Mega Millions." The Ohio Lottery Commission and the state of Ohio are participating in a multi-state venture. To use a sports analogy, a baseball player does not conduct a baseball game if the player's only true power is to walk off the field. The rules were established by the other players before the Ohio player arrived at the game. The other players can change the rules or keep the present rules whether the Ohio player agrees with them or not. The game will continue whether the Ohio player continues to play or not. The Ohio player can participate in the game, but the Ohio player does not, in any sense of the word, "conduct" the game.
 {¶ 73} The voters of Ohio, in enacting present Section 6, Article XV, and in creating a narrow exception to the complete and "forever" ban on lotteries in Ohio, did not authorize Ohio to participate in lotteries such as the present multi-state lottery. In fact, multi-state lotteries did not exist in 1975. We cannot speculate about what the voters would have done had the prospect of a multi-state lottery been presented to them. Indeed, we cannot speculate about what present-day voters would do if asked to approve Ohio's participation in a multi-state lottery today. We can only look at the language the voters approved and see that the voters did not approve of situations where Ohio contracts with a coalition of other states to participate in a lottery Ohio does not in any sense of the word conduct.
 {¶ 74} I believe we can discern why Ohio voters crafted such a narrow exception to the ban on lotteries. Gambling has traditionally had links to organized crime, whether in the form of illegal organizations conducting a "numbers game" or in other forms of racketeering organizations. Allowing the state of Ohio to contract with a third party to run a lottery ran the risk of organized crime becoming involved. A lottery conducted by an agency of the government is more immune to such corrupting influences.
 {¶ 75} The legislature also clearly flouted the intention of the voters of Ohio when it made provisions for distribution of the anticipated (and apparently vastly over-estimated) profits from Ohio's participation in the multi-state lottery. The trial court overturned part of the unconstitutional diversion of funds. However, the efforts of the majority to avoid the remaining mandates of Section 6, Article XV by manipulating the definition of "net proceeds" to allow other states and their citizens to receive most or all of the funds generated by the multi-state lottery before the public schools of Ohio are entitled to any funds I find to be, at best, unconvincing.
 {¶ 76} I also find it tragic that only when a violation of a provision of the Ohio Constitution is "manifestly gross and fraudulent" will that provision be enforced. The single-subject provision of the Ohio Constitution is an extremely wise provision because it requires individual consideration of important pieces of legislation rather than the lumping together of diverse pieces of legislation which please individual legislators in order to generate the number of votes required for passage. If the single-subject provision were enforced, the people of Ohio would see fewer bills which extend for hundreds of pages and more rational thought about what the law of Ohio should be.
 {¶ 77} I do not address the remaining issues of public policy, such as funding state government through use of money obtained from persons who can least afford to give it up and/or persons who suffer from a gambling addiction. Those issues are more appropriately addressed in the legislative arena. Instead, I limit my comments to what I discern as being a failure of the Ohio legislature to follow the document which is the foundation of all Ohio government — the Ohio Constitution.
 {¶ 78} I respectfully dissent.